1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

10

11

12

13

14

| | |
|---|---|
| CRAIG D. HANSON,<br><br>                    Plaintiff,<br><br>        v.<br><br>COUNTY OF KITSAP, WASHINGTON, DAVID LYNAM, KITSAP COUNTY FIRE MARSHAL, JOHN AND JANE DOE, EMPLOYEE-AGENTS AND FORMER EMPLOYEE AGENTS OF KITSAP COUNTY,<br><br>                    Defendants. | CASE NO. 13-5388 RJB<br><br>ORDER ON PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT |

15

16

17

18

19

20

21

22

23

24

        This matter comes before the Court on the Defendants' Motion for Partial Summary Judgment Regarding Claims for Reemployment, Failure to Promote, and Discrimination (Dkt. 77), Plaintiff's Cross Motion for Partial Summary Judgment (Dkt. 97), Defendants' Motion for Partial Summary Judgment Regarding Hostile Work Environment, Constructive Discharge and Retaliation (Dkt. 90), Plaintiff's motion to strike (Dkt. 33) and Defendants' motion to strike (Dkt. 128).  The Court has considered the pleadings filed regarding the motions and the remaining file.

        Plaintiff, a veteran of the United States Army, United States Marine Corps, and Washington Army National Guard, filed this employment case pursuant to Uniformed Services Employment and Reemployment Rights Act ("USERRA") 38 U.S.C. § 4301, *et seq*. and state law on May 22, 2013.  Dkt. 1.  In his second Amended Complaint, Plaintiff makes USERRA - based

1   claims for discrimination in employment based on his military service under 38 U.S.C. § 4311,

2   for retaliation under § 4311, failure to reemploy to the proper reemployment position under §§

3   4312 and 4313; failure to provide proper benefits under § 4316; discharge without cause under §

4   4316; and for failure to properly pay employee pension and other benefits under § 4318. Dkt.

5   45. Plaintiff also makes state law claims for violations of the Washington Law Against

6   Discrimination ("WLAD"), Washington's Public Records Act, defamation and liquidated damages.

7   *Id.* He seeks damages, attorneys' fees, and costs. *Id.*

8        Defendants move for summary dismissal of Plaintiff's state and federal claims based on

9   Plaintiff's allegations that Defendants:  1) failed to reemploy and promote Plaintiff, 2) denied

10   Plaintiff the statutorily protected benefits of employment, 3) failed to pay Plaintiff's longevity

11   bonus, 4) failed to contribute to Plaintiff's retirement plan, and 5) acted with discriminatory intent

12   in failing to reemploy or promote Plaintiff.  Dkt. 77.

13        Plaintiff filed a response to Defendants' partial motion for summary judgment and made a

14   cross motion for partial summary judgment.  Dkt. 97.  Plaintiff argues that he should be granted

15   summary judgment on his claims that Defendants violated his USERRA rights by: 1) failing to

16   properly reemploy him in violation of §§ 4312 and 4313, 2) failing to give him his 2012

17   longevity bonus in violation of §§ 4311 and 4316, 3) discharging him without cause violation of

18   § 4316(c), 4) failing to properly contribute to his pension in violation of § 4318, and 5)

19   repeatedly discriminating against him due to his military service.  *Id.*  Plaintiff argues that

20   Defendants' motion for partial summary judgment should be denied as to whether Defendants

21   acted with discriminatory intent in failing to reemploy or promote Plaintiff.  *Id.*

22        Defendants also filed a Motion for Partial Summary Judgment regarding Hostile Work

23   Environment, Constructive Discharge and Retaliation.  Dkt. 90.  Defendants argue that all

24

1   Plaintiff's claims based on the allegations that Defendants created a hostile work environment,

2   Plaintiff was constructively discharged, and that Defendants retaliated against Plaintiff be

3   dismissed.  Dkt. 90.  Plaintiff opposes the motion.  Dkt. 123.

4        For the reasons set forth below, Defendants' motions should be granted, in part, and

5   denied, in part.  Plaintiff's cross motion should be granted as to his § 4318 claim (pension) and

6   denied in all other respects.

7   # I.    FACTS AND PROCEDURAL HISTORY

8       On October 1, 2013, Plaintiff's motion for an order granting partial summary judgment on the

9   issue of liability regarding his USERRA claims under 38 U.S.C. §§ 4312, 4313 (reemployment),

10  4316 (benefits & without cause discharge) and 4318 (pension) was denied.  Dkt. 37.  The

11  following facts are taken from the parties' submissions in support of the present motions, and the

12  record in accord with Fed. R. Civ. P. 56(c)(3).

13  ## A.  FACTS

14      On March 14, 2007, Kitsap County, Washington, hired Plaintiff as a Deputy Fire Marshal

15  1 ("DFM 1").  Dkts. 25-1, at 1; 103, at 42.  When he was hired, his supervisor, Fire Marshal David

16  Lynam, was aware that Plaintiff was serving in the Washington Army National Guard and would

17  need to take a military leave of absence from time to time.  Dkts. 34, at 1; 103, at 53-54.  On

18  April 7, 2007, Plaintiff was assigned a radio call sign of "FM3."  Dkt. 25-1, at 1-2.  Kitsap County

19  issued boots, a badge, an identification card, and a vehicle to Plaintiff.  Dkt.  25-1, at 2.

20      As a DFM 1, Plaintiff conducted building inspections.  Dkt. 25-1, at 2.  He also

21  performed "out of class" work conducting fire investigations, which is work typically done in

22  Kitsap County by a Deputy Fire Marshal 2 ("DFM 2").  Dkt. 25-1, at 2.  The office had a fire

23  investigation rotation system where the marshals would take turns being on duty approximately

24

1    every three weeks. Dkt. 103, at 69.  They got paid extra for overtime, to be on call, and if they

2    went out to do an investigation. Dkt. 106, at 12.  The amount of investigations in any one week

3    depended on the number of fires that week.  Dkt. 103, at 69.  The number of hours it took to

4    investigate a fire varied as well.  Dkt 113, at 5.  Plaintiff acknowledges that his hours fluctuated.

5    Dkt. 98, at 2.  From 2007-2009 Plaintiff conducted at least 48 fire investigations.  Dkt. 25-1, at 2.

6    Plaintiff was paid for each hour of investigative work he completed.  Dkts. 33, at 3; 103, at 43.

7    (Defendants now note that this was in error because under the Collective Bargaining Agreement,

8    in order to be paid for out of class work, he needed to work ten consecutive days at that work,

9    and he never did.  Dkt. 33, at 3-4.  Further, assisting in fire investigations was a part of DFM 1's

10   duties.  Dkt. 33, at 4.  Defendants state that they are now following the Collective Bargaining

11   Agreement in this regard.  Dkt. 33, at 4.)  In any event, Plaintiff did not perform all the duties

12   associated with the position of DFM 2.  Dkts. 25-1, at 2; 34, at 2; 114, at 6.

13        The Kitsap Board of County Commissioners have the sole authority to create and fund

14   positions within the county.  Dkt. 34, at 6.  Insofar as the positions relevant to this case are

15   concerned, a Collective Bargaining Agreement ("CBA") regulates how job vacancies can be filled.

16   Dkt. 34, at 5.  DFM 1s do not "automatically" advance to DFM 2.  Dkt. 33, at 4.  In May of 2007, a

17   newly created DFM 2 position was opened for applications, but was revoked due to a hiring

18   freeze.  Dkts. 25-1, at 2; 33; 34, at 7; and 103-1, at 71.  Kitsap County did not open a job vacancy

19   for a DFM 2 position again until February of 2013.  Dkt. 34, at 7.

20        In 2008 through mid-2009, in addition to the funding the position of Fire Marshal (which

21   was held by Mr. Lynam), Kitsap County funded one full time DFM 2 position (Tina Turner) and

22   two full-time DFM 1 positions (Plaintiff and Jackie Blackwood).  Dkt. 34, at 5.  Ms. Blackwood

23   began working for Kitsap County in 1993 and was hired as a DFM 1 in 2008.  Dkt. 33, at 5.  Ms.

24

ORDER ON PARTIES' MOTIONS FOR PARTIAL
SUMMARY JUDGMENT- 4

1   Blackwood was assigned a radio call sign of "FM4." Dkt. 109, at 4.  As a consequence of the

2   economic recession, in mid-2009, the DFM 1 positions were reduced to .90 FTE (36 hours a

3   week).  Dkt. 34, at 5 and 48.

4        In October of 2009, Plaintiff notified Kitsap County that he had been called for active

5   duty military service, and began that service in November of 2009.  Dkt. 25-1, at 3.  Before he

6   left, Plaintiff returned his badge, identification card, phone, and vehicle to Mr. Lynam.  Dkts. 25-

7   1, at 3; and 103, at 59-60.

8        After Plaintiff left, the county hired two people as temporary "extra help." Dkt. 103-1, at

9   67.  Brad Wiggins was hired as a DFM 2 and Shawn Shepherd was hired as a DFM 1.  Dkt. 103,

10  at 60.  Mr. Wiggins was hired to do fire investigations, and was assigned the emergency radio

11  call sign "FM3." Dkts. 103-1, at 68; 103, at 60.  Mr. Wiggins was given Plaintiff's old badge.  Dkt.

12  103, at 60.  Mr. Shepherd was hired to do building inspections, particularly as it pertained to

13  more complex and specialized work that had arisen in the county.  Dkt. 103-1, at 69.  Mr.

14  Shepherd was not given a radio call sign or badge.  Dkt. 103, at 60.

15       While Plaintiff was on active duty, Kitsap County had to further cut its budget due to the

16  recession.  Dkt. 34, at 5.  Effective 2011, the DFM 1 positions were reduced to .85 FTE (34

17  hours per week).  Dkt. 34, at 5.  During that time, the Fire Marshal's office also had to relocate to

18  a different building.  Dkt. 34, at 7.  The Department of Community Development, of which the

19  Fire Marshal's office is part, had to lay off more than 20 employees and had to eliminate 9

20  vehicles.  Dkt. 34, at 7.  There were points after Mr. Hansen left that everybody in the

21  department worked less than full time.  Dkt. 103, at 60.

22

23

24

1    Plaintiff returned to work for Kitsap County on December 3, 2012, after being honorably

2    discharged on November 30, 2012.  Dkts. 25-1, at 3 and 98, at 2.  He is a disabled veteran with a

3    30% disability rating for Post Traumatic Stress Disorder ("PTSD").  Dkt. 98, at 1.

4                   1.   <u>Post Return Equipment and Training</u>

5    After Plaintiff returned, he, like all the other employees, had access to at least two shared

6    vehicles.  Dkts. 98, at 2; 34, at 8.  Plaintiff shared a vehicle "more often than not" with Brad

7    Wiggins.  *Id*.  Plaintiff was given a new radio identifier, "FM5," for 911 calls.  Dkt. 34, at 5.

8    Plaintiff was issued a new employee identification badge.  Dkt. 34, at 8.  Plaintiff was not

9    given a fire marshal badge.  Dkt. 78, at 23.  Although Plaintiff requested a "protective case for

10   new expensive phone" (Dkt. 25-1, at 64), the county did not buy such an item for anyone in the

11   Fire Marshal's office.  Dkt. 103, at 69.  Plaintiff testified that after he returned, he threw the

12   boots the county had originally given him away because they were worn out and asked for new

13   boots.  Dkt. 78, at 7.  In response to his request, Mr. Lynam asked Plaintiff to check in the

14   evidence locker and see if the boots he had before he left on deployment were in there.  Dkt. 34,

15   at 11.  Mr. Lynam later saw Plaintiff with boots on during a fire investigation, and then saw a

16   pair of boots with Plaintiff's gear in the back of a response vehicle.  Dkts. 103, at 69 and 34, at

17   11.  Mr. Lynam assumed that Plaintiff had found his boots.  Dkt. 34, at 11.  Plaintiff testified that

18   he purchased new boots, but did not ask the county to reimburse him because he wore those

19   boots "on civilian time too."  Dkt. 78, at 8.  Mr. Lynam also told Plaintiff that Central Kitsap Fire

20   and Rescue had surplus boots and had offered them to the Fire Marshal's office.  Dkt. 34, at 11.

21   While Plaintiff was gone on deployment, his fire inspector certification lapsed.  Dkt. 34,

22   at 10.  After his return, Kitsap County paid for him to attend international building code update

23   training, international fire code update training, and training in design and installation of

24

1   residential fire sprinklers.  Dkt. 34, at 10.  He participated in the state Fire Sprinkler Coalition,

2   and attended a two day training at a sprinkler forum.  Dkt. 34, at 10.  Plaintiff also attended once-

3   a-week in house training sessions.  Dkt. 34, at 10.  Plaintiff was asked to sign up for the annual

4   State Fire Marshal Program for sprinkler installers, designers, and fire code authorities and a

5   class on juvenile fire setters.  Dkt. 34, at 11.  Plaintiff received, at Kitsap County's expense,

6   approved training sufficient to obtain his required certification for inspections, which was

7   required for his DFM 1 position.  Dkt. 34, at 11.  Plaintiff, apparently, was recertified.

8   Defendants denied Plaintiff's request to attend out-of-state training.  Dkt. 34, at 10.  Defendants

9   explain that due to budget constraints, the Fire Marshal's office now rarely sends employees to

10  out-of-state training because sufficient training is offered in Washington.  Dkt. 34, at 10.  The

11  county denied Plaintiff's request to attend a basic fire investigation course because he completed

12  this course in 2008 and sent another employee, Ms. Blackwood, who had not yet attended.  Dkt.

13  130, at 1.  Plaintiff received his certificate on May 16, 2008.  Dkt. 130, at 7.

14              2.   Post Return Retirement Contributions and Longevity Bonus

15          While Plaintiff was an employee of Kitsap County, he participated in the Washington

16  State Department of Retirement System, Public Employees' Retirement System Plan 3 ("PERS 3").

17  Dkts. 25 and 103-1, at 78.  On February 21, 2013, Plaintiff contacted the Kitsap County payroll

18  department by e-mail and requested that Kitsap County make contributions to his PERS 3

19  retirement account for November 2009 to December 2012.  Dkt. 25-1, at 81.  Kitsap County,

20  calculated his compensation based on the number of hours Plaintiff's position was approved to

21  have worked while on leave.  Dkt. 118.  It then notified the state, and on receipt of an invoice

22  from the Department of Retirement Systems, on June 17, 2013, Kitsap County paid $8,798.26

23  into Plaintiff's PERS 3 account.  Dkts. 33 at 2 and 33-1, at 3.

24

1     Kitsap County awards employees with over five years of service longevity bonuses of 1%

2  of their annual pay.  Dkt. 33, at 2.  The bonus is based on actual wages paid.  Dkt. 33, at 2.  In

3  March of 2013, Plaintiff was given a five year longevity bonus of $263.47.  Dkt. 25-1, at 7.  On

4  March 27, 2014, the county sent Plaintiff an additional check for $43.33 for his 2012 longevity

5  bonus based on the 21 days of military pay he received between March 2011 and March 2012.

6  Dkt. 98, at 21.  The county acknowledges that it "did not discover that the [2012] longevity bonus

7  was not paid until March 2014." Dkt. 98, at 21.

8                  3.   Post Return Duties and Work Environment

9     Beginning in December 2012, Plaintiff was placed on the fire investigation call-out

10  rotation approximately every third week.  Dkt. 34, at 9.  Initially, Plaintiff "shadowed" Mr. Lynam

11  (who was the lead investigator) on fire investigations occurring in December 2012 and early

12  January 2013.  Dkt. 34, at 9.  Mr. Lynam encouraged Plaintiff to shadow others when he was

13  able, in order to "get [him] the experience and back up to speed as quickly as possible." Dkt. 103,

14  at 69.  Mr. Lynam had taken on more work duties, and so was trying to get out of the fire

15  investigation rotation.  Dkt. 103, at 64. On two occasions in December 2012, Plaintiff was called

16  to assist with fire investigations, and he declined.  Dkt. 34, at 9.  These investigations were

17  optional and Plaintiff was at holiday events.  Dkt. 103, at 69.  In late January 2013, Mr. Lynam

18  then shadowed Plaintiff, who was the lead, for fire investigations occurring in late January and

19  early February 2013.  Dkt. 34, at 9-10.  Prior to his deployment, Plaintiff conducted about a third

20  of the fire investigation work.  Dkt. 113, at 4.  When he returned, beginning December 1, 2012

21  until the end of April 2013, Plaintiff performed 17 fire investigations, Mr. Wiggins performed

22  14, Mr. Lynam performed 9, and Ms. Turner performed 7.  Dkt. 113, at 11-12.  Of the 47

23  investigations, Plaintiff, then performed around 36% of the investigations.

24

1        In late-December 2012, Plaintiff requested that Mr. Lynam remove Brad Wiggins from

2   the investigation rotation and remove Shawn Shepherd from inspection work so Plaintiff could

3   resume the full work-load that he felt he had prior to his mobilization.  Dkt. 25-1, at 5.  Mr.

4   Lynam denied that request because he was trying to get out of the fire inspection rotation.  *Id.*

5        On January 2, 2013, Plaintiff filed a complaint with the federal Employer Support for

6   Guard and Reserve ("ESGR").  Dkt. 98, at 4.  In his complaint, he asked for the FM3 call sign, his

7   badge, and that Mr. Wiggins be removed from his extra help duties.  Dkt. 98, at 4.

8        After his return from active duty, Plaintiff felt that his co-workers were treating him

9   poorly.  Dkt. 98, at 3.  He asserted that Ms. Blackwood and Ms. Turner (and, at times, Mr.

10  Wiggins) were "short, curt, and disrespectful."  Dkt. 98, at 3.  He felt ostracized.  Dkt. 98, at 4.

11  According to Plaintiff, people did not say "hi" to him first, he had to say "hi" first, and then they

12  would reciprocate.  Dkt. 91, at 7-10.  He asserted that Mr. Wiggins once bought donuts in, and

13  offered them to everyone else except him, but when he asked for one, Mr. Wiggins gave him

14  one.  Dkt. 91, at 13-14.  Plaintiff never got asked to go to lunch, but he and Mr. Wiggins would

15  go and have coffee together.  Dkt. 91, at 14 and 17.  He felt he was excluded from meetings.  Dkt.

16  91.  He alleged Ms. Blackwood and Ms. Turner would "[stick] their hands in [his] face and [say],

17  in a loud angry voice, 'go talk to Dave."  Dkt. 98, at 3.  He alleges that he asked another co-

18  worker, Jason Rice, why everyone was so upset, and Plaintiff maintains that Mr. Rice said "words

19  to the effect of 'people are all assed out that you're back [from military duty] because they think

20  they're gonna [sic] get their hours cut."  Dkt. 98, at 3.  Plaintiff complained repeatedly to Mr.

21  Lynam throughout the December 2012–August 2013 timeframe about his co-worker's treatment

22  of him.  Dkt. 98, at 3.  He asserted that Tina Turner said "words to the effect" that he "had not been

23

24

1  here long enough to deserve to have the [FM3] call sign back given that [he] was on military

2  orders," and he complained to Mr. Lynam about that statement.  Dkt. 98, at 3.

3      Plaintiff states that he repeatedly asked Mr. Lynam to arrange a meeting with Plaintiff

4  and his co-workers so Plaintiff could tell them "what they were doing to [him] hurt [him]." Dkt.

5  98, at 4.  Plaintiff asserts that he told Mr. Lynam that the way he was being treated made his

6  PTSD worse and that Mr. Lynam did not act.  Dkt. 98, at 4.

7      Mr. Lynam testified that he did not put a meeting together because he did not "see

8  anything good that was going to come out of it." Dkt. 103, at 66.  Mr. Lynam noticed some

9  "friction," and talked with people about it, but felt that a meeting was something that Plaintiff

10  could have done on his own.  Dkt. 103, at 66.

11      After the ESGR complaint, Mr. Lynam made an effort to have more meetings which

12  included Plaintiff and used Sharepoint to exchange information.  Dkt. 103, at 68.  Mr. Lynam

13  reminded Ms. Blackwood to help Plaintiff with the computer systems and encouraged

14  department members to make sure Plaintiff had shadowing opportunities, was included in

15  conversations, and project development.  Dkt. 103, at 68.

16      In late January 2013, Plaintiff stated that he again asked for his boots, shirt, and badge,

17  and was not given those items.  Dkt. 98, at 4.  Mid-February 2013, Plaintiff again requested that

18  Mr. Shepherd and Mr. Wiggins be taken off of their duties.  Dkt. 25-1, at 6.

19          4.  Post Return Application for DFM 2 Position

20      In the 2013 budget, the Kitsap Board of County Commissioners authorized

21  reclassification of one of the two DFM 1 positions to a DFM 2 position and reduction of the

22  second DFM 1 position to .85 FTE (34 hours).  Dkt. 33, at 4.  In February of 2013, the county

23  posted a notification that it had an opening for a DFM 2.  Dkt. 103-1, at 72.  The notification

24

1   contained a section entitled "Required Education and Experience," which included, in part, "three

2   years experience in fire prevention and investigation work equivalent to the Deputy Fire Marshal

3   1 position." Dkt. 103-2, at 63.  Plaintiff and Ms. Blackwood applied for the job.  Dkt. 103-1, at

4   72.

5           A panel compiled by Mr. Lynam interviewed them for the position.  Dkt. 103-1, at 72.

6   The panel was composed of Warner Webb, the Pierce County Fire Marshal, Jeffrey Rowe,

7   Deputy Director of Kitsap County's Department of Community Development, Wayne Senter,

8   Executive Director of the Washington Fire Chiefs Association, and Jonathan Dunaway, the Clark

9   County Fire Marshal.  Dkts. 110, 111, 112, 115.

10          Both candidates were asked essentially the same questions and follow-up questions.

11  Dkts. 110, at 4-5 and 111, at 4.  They were asked about their prior work experience and customer

12  service skills.  *Id.*

13          In Mr. Webb's view, Ms. Blackwood was better about giving specific examples of past

14  work history and had better customer service skills.  Dkt. 110, at 5.  Mr. Webb noted that

15  Plaintiff gave inconsistent answers regarding work history, including stating that he had never

16  shut a business down and then later acknowledging that he had.  Dkt. 110, at 5.  When

17  questioned, Plaintiff was unable to explain his inconsistent answers.  Dkt. 110, at 5.  Mr. Webb

18  stated that although Plaintiff discussed his military experience, it did not appear directly related

19  to the job duties expected of a DFM 2.  Dkt. 110, at 5.  Mr. Webb stated that he did not view

20  Plaintiff's military service in a negative light.  *Id.*

21          Mr. Rowe stated that he gave Plaintiff a score of 20 and Ms. Blackwood a score of 29.

22  Dkt. 111, at 4. Mr. Rowe did not view Plaintiff's prior military experience negatively.  Dkt. 111,

23  at 4.  In Mr. Rowe's opinion, Plaintiff appeared "overly confident and arrogant" and appeared to

24

1    lack "integrity and credibility." Dkt. 111, at 5.  Mr. Rowe was very concerned about Plaintiff's lack

2    of credibility because he was aware that DFM 2s sometimes end up in court, and need to be good

3    witnesses. Dkt. 111, at 5-6.  Mr. Rowe was also concerned about Plaintiff's description of his

4    leadership style as leading by establishing a "common enemy." Dkt. 111, at 6.  This style is the

5    opposite of the collaborative leadership style which is the preferred style in the department.  Dkt.

6    111, at 6.  Mr. Rowe indicated in his notes that Plaintiff "seems very military centric," reflecting

7    Mr. Rowe's observation about the leadership style Plaintiff described. Dkt. 111, at 6.  Mr. Rowe

8    stated that Plaintiff's military service "had no bearing on how [he] scored Plaintiff." Dkt. 111, at 6-

9    7.  He felt that Ms. Blackwood's weaknesses could be overcome by training, and that Plaintiff's

10   lack of credibility and integrity could not.  Dkt. 111, at 7.

11          Mr. Senter, also a military veteran, stated that he was surprised at Plaintiff's "cavalier

12   demeanor" during the job interview, and even more surprised that Plaintiff described himself as

13   an "overbearing, arrogant jerk." Dkt. 112, at 5.  Plaintiff appeared to have poor interpersonal

14   skills.  Dkt. 112, at 7.  Like Mr. Rowe, Mr. Senter was concerned with Plaintiff's description of

15   his leadership style as creating a "common enemy" because it suggested to Mr. Senter that Plaintiff

16   might "attempt to foster a relationship with another person or entity by creating an enemy in a

17   coworker or other county agency," and that was not how relationships should be built in the fire

18   service industry.  Dkt. 112, at 5.  Mr. Senter noted that Plaintiff gave contradictory answers in

19   the interview and was unable to explain those contradictions.  Dkt. 112, at 5.  Mr. Senter had the

20   impression that Plaintiff was not honest and that gave him concern.  Dkt. 112, at 7.  Mr. Senter

21   felt Ms. Blackwood had better problem solving and interpersonal skills.  Dkt. 112, at 6.  In his

22   view, she had sufficient technical skills.  Dkt. 112, at 6-7.  Plaintiff's military service did not

23

24

1   negatively impact the scores Mr. Senter gave him.  Dkt. 112, at 7.  Mr. Senter, a veteran, states

2   that he views military service as a "positive quality." Dkt. 112, at 7.

3        Mr. Dunaway notes that Plaintiff gave an incorrect explanation about the fire code and

4   felt that he did not seem to have a "good grasp as to what the code requires versus what the code

5   recommends." Dkt. 115, at 5.  Mr. Dunaway felt that Plaintiff thought that he "could take on more

6   authority than allowed by the code, without approval from the Fire Marshal." Dkt. 115, at 5.  This

7   was a "big concern" for Mr. Dunaway, particularly in light of the further impression Plaintiff gave

8   that he was unwilling to learn.  Dkt. 115, at 5.  Mr. Dunaway states that the fact of Plaintiff's

9   military service did not play into how he was scored.  Dkt. 115, at 6.  Mr. Dunaway maintains

10  that "if he had described similar experience in a non-military setting, [Mr. Dunaway] would have

11  given him the same score." Dkt. 115, at 6.

12       Plaintiff perceived the interview questions regarding his military service as "hostile and

13  mocking," particularly those from Mr. Senter, who is also a veteran. Dkt. 98, at 5.  Plaintiff stated

14  during the interview that he worked for the county "on and off" due to his military service.  Dkt.

15  98, at 6.

16       No one on the panel mentioned Plaintiff's military service in the post interview

17  discussions.  Dkts. 110, at 6; 111, at 7; 112, at 7; 115, at 6.  Plaintiff had a total score of 102.5

18  and Ms. Blackwood had a score of 124.0.  *Id.*  Based on the panel's scores, Ms. Blackwood was

19  promoted effective May 1, 2013.  Dkt. 114, at 6.  Ms. Blackwood's radio call sign did not change–

20  it remained "FM4." Dkt. 109, at 4.

21            5.   Post DFM 2 Interview Events

22       Plaintiff was removed from the "investigative call out" rotation on April 25, 2013.  Dkt. 25-

23  1, at 3. Plaintiff assumed the DFM 1 duties that Ms. Blackwood had been performing.  Dkt. 34,

24

1    at 13.  Defendant explains that Plaintiff was not given any more investigative work because of

2    the amount of DFM 1 work that existed.  Dkt. 34, at 13.  According to Defendants, if Plaintiff

3    had continued to do investigations, the department would have been without sufficient resources

4    to complete all the DFM 1 work.  Dkt. 34, at 16.

5          Plaintiff filed a Notice of Tort Claim with the county of April 29, 2013.  Dkt. 98, at 19.

6          Mr. Lynam typed up a summary of the interviewers' notes after the interview for the DFM

7    2 position in order to discuss it with Plaintiff and help him perform better in future interviews.

8    Dkt. 113.  Tricia Bennon, a Kitsap County employee that shares office space with the Fire

9    Marshal's office, asserts that she found this summary on a credenza in the office.  Dkt. 100, at 2.

10   She told Plaintiff about it and suggested that he retrieve it.  Dkt. 100, at 2.  Mr. Lynam does not

11   remember placing the summary on the credenza outside his office, did not see it there, and stated

12   that if he did leave it there, it was inadvertent.  Dkt. 113.  The summary included bullet points

13   which stated, in part, "[t]endency to tell others including fire departments what he decided rather

14   than using a collaborative environment," "[o]verbearing, arrogant, 'jerk' in answers and body

15   language.  Aware that he offends others but no process to keep it in check or modify behaviors,"

16   "weak on intent and application of code where prescriptive sections of the code are

17   recommendations," and "[s]exist response 'firemen' verse firefighters, infantrymen verses soldiers."

18   Dkt. 100, at 7.

19         In May 2013, after the interview, Mr. Lynam asked Plaintiff to meet with him to discuss

20   the interview.  Dkt. 103, at 80.  Plaintiff initially responded in an email that he would rather not

21   do so, but he eventually did.  *Id.*

22         Around the time Ms. Blackwood was promoted, she approached Mr. Lynam about

23   Plaintiff's treatment of her.  Dkt. 103-1, at 3.  Mr. Lynam and Mr. Rowe interviewed Ms.

24

Blackwood who reported that Plaintiff spoke rudely to her, lost his temper with her, and was angry with her since her promotion.  Dkt. 103-1, at 3.  A report was made of the interview and it was treated as a complaint against Plaintiff.  Dkt. 103-1, at 3.  Ms. Blackwood was asked to advise the county "of any further issues between her and [Plaintiff]."  Dkt. 103-1, at 4.  Ms. Blackwood reported, by email, at least three other incidents.  Dkt. 103-1, at 4.  The county began an investigation in accord with county policy.  Dkt. 92, at 3.

Plaintiff felt that at this point, his "fellow employees were collecting intelligence data on [him]."  Dkt. 91, at 22.

In late May 2013, as a result of statements in his Notice of Tort claim, the county began an investigation into Plaintiffs health and the sent Plaintiff forms for his doctor to fill out and return.  Dkt. 58-1, at 2.  The form from Plaintiffs health care provider indicates that he has PTSD, but has no limitations in the performance of his job.  Dkt. 58-1, at 6.  His healthcare provider recommended "decreasing stressful environment" in response to a request for suggestions of possible accommodations to help Plaintiff improve his job performance.  Dkt. 58-1 at 6.  Plaintiff gave this form back to the county around June 19, 2013.  Dkt. 58-1, at 2.

In late July or early August 2013, Plaintiff responded to a fire call without being dispatched.  Dkt. 98, at 7.  Plaintiff stated that he did so "to help the police and emergency workers apprehend the suspect."  Dkt. 98, at 7.  The county received a complaint about it from the responding agency, Central Kitsap Fire and Rescue, and so began the progressive discipline process against Plaintiff.  Dkt. 103, at 50.

Plaintiff applied for and accepted a job in Boise, Idaho.  Dkt. 91, at 34.  On August 23, 2013, Plaintiff resigned from Kitsap County.  Dkt. 33, at 3.

**B.  USERRA AND ORGANIZATION OF OPINION**

1    'USERRA protects the job security of returning veterans. Several provisions of USERRA

2    coordinate to provide this security: Sections 4312 and 4313, the 'reemployment provisions,' entitle

3    veterans to reemployment after military service and prescribe the positions to which they are

4    entitled upon returning." *Petty v. Metropolitan Government of Nashville & Davidson County*, 687

5    F.3d 710 (6th Cir. 2012) (*internal citations omitted*).   Section "4316 guarantees veterans the same

6    benefits they would have enjoyed absent the interruption in their employment and prevents

7    employers from terminating without 'cause' any returning veteran within one year of his

8    reemployment." *Id.*   The 'discrimination provision,' § 4311, "prohibits employers from

9    discriminating against veterans on the basis of their military service." *Id.*   Section 4318 governs

10   pension plan benefits for returning veterans.   38 U.S.C. § 4318.

11        This opinion will first address the motions to strike.   Then it will address the summary

12   judgment motions related to Plaintiffs USERRA claims under §§4312 and 4313 (reemployment),

13   Plaintiffs claims under § 4316 (benefits) and then § 4316 (without cause discharge).   The opinion

14   will then turn to Plaintiffs USERRA claims under § 4311 (discrimination) and the WLAD claims

15   together.   Lastly, this opinion will rule on the motions related to Plaintiffs USERRA claims

16   under § 4318 (pension).

17                        **II.**     **DISCUSSION**

18   **A.  MOTIONS TO STRIKE**

19        Plaintiff moves to strike the Affidavit of Penny Starkey (Dkt. 33) as argumentative, irrelevant

20   and contradictory.   This motion should be denied. To the extent that it contains irrelevant

21   material, it was not considered.

22

23

24

Defendants move to strike the Statements of Kim Dunn, statements of the ESGR employee
Mr. Jacobson, Jeff Rimack's Declaration (Dkt. 25-5), and certain statements of Ms. Blackwood as
hearsay.  Dkt. 128.  It is all hearsay.  This motion should be granted.

**B.  SUMMARY JUDGMENT – STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on
file, and any affidavits show that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is
entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient
showing on an essential element of a claim in the case on which the nonmoving party has the
burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue
of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find
for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586
(1986)(nonmoving party must present specific, significant probative evidence, not simply "some
metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a
material fact exists if there is sufficient evidence supporting the claimed factual dispute,
requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty
Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors
Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court
must consider the substantive evidentiary burden that the nonmoving party must meet at trial–
e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.
Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor
of the nonmoving party only when the facts specifically attested by that party contradict facts

1  specifically attested by the moving party.  The nonmoving party may not merely state that it will

2  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

3  to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

4  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be

5  "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

6  **C.  USERRA CLAIMS UNDER §§ 4312 and 4313 (REEMPLOYMENT)**

7  Section 4312 of USERRA provides a right to reemployment for members of the armed

8  services who comply with statutory notification requirements.  *Wallace v. City of San Diego*, 479

9  F.3d 616, 625 (9th Cir. 2007).  There is no dispute here that Plaintiff met the statutory

10  requirements.

11  USERRA's § "4312 protects only a serviceperson's right to reemployment, which in turn

12  triggers § 4313's guarantee of the appropriate position of employment." *Petty v. Metro. Gov. of*

13  *Nashville-Davidson County*, 538 F.3d 431 (6th Cir. 2008). "Section 4312 only entitles a service

14  person to immediate reemployment and does not prevent the employer from terminating him the

15  next day or even later the same day, while "§§ 4311 and 4316 operate to protect the employee as

16  soon as he is reemployed." *Hart v. Family Dental Group, PC*, 645 F.3d 561 (2nd 2011)(*citing*

17  *Petty v. Metro. Gov. of Nashville-Davidson County*, 538 F.3d 431 (6th Cir. 2008); *Francis v.*

18  *Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 304 (4th Cir.2006); *Clegg v. Ark. Dep't of Corr.*,

19  496 F.3d 922, 930 (8th Cir.2007)).

20  For returning veterans who were deployed for over 90 days, reemployment is to "the position

21  of employment in which the person would have been employed if the continuous employment of

22  such person with the employer had not been interrupted by such service, or a position of like

23  seniority, status and pay, the duties of which the person is qualified to perform." 38 U.S.C. §

24

4313(a)(2)(A).  Regulations promulgated under USERRA note that as a general rule, "the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service." 20 C.F.R. § 1002.91.  This position is referred to as the "escalator position." *Id.*

> The principle behind the escalator position is that, if not for the period of uniformed service, the employee could have been promoted (or, alternatively, demoted, transferred, or laid off) due to intervening events. The escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service. Depending upon the specific circumstances, the employer may have the option, or be required, to reemploy the employee in a position other than the escalator position.

20 C.F.R. § 1002.91.

Defendants' motion for summary dismissal of Plaintiff's claim that Defendants violated USERRA's reemployment provisions under 38 U.S.C. §§ 4312 and 4313 should be granted, Plaintiff's cross motion on the claim denied, and the claim dismissed.

Plaintiff maintains that when he returned from service, he should have been reemployed in a DFM 2 position, given the same pre-deployment hours, his prior radio call sign "FM3" back, a deputy fire marshal specific identification card, badge, new boots, and exclusive vehicle access. Dkt. 97, at 19-21.

Plaintiff has failed to raise genuine issues of material fact precluding summary judgment in favor of Defendant on this claim.  When Plaintiff left for military service in 2009, he held the position of a DFM 1.  When he returned, he was put in the position of a DFM 1.  Although Plaintiff alleges that he was performing "out of class" work, that was performing duties associated with the position of DFM 2, he fails to point to any evidence that he was performing all of the duties of a DFM 2.  His supervisor, Mr. Lynam, stated that Plaintiff was not at any time performing all the duties of a DFM 2. Dkt. 34, at 5.  Plaintiff points to an organizational chart

1   and a letter that lists him as a DFM 2, the Kitsap County explains that the chart includes the

2   designation "(OOC)," which meant he was "being paid at DFM 2 level via the out of class process"

3   and that the letter reflects the same.  Dkt. 114, at 6.  Plaintiff does not dispute this.  Further, the

4   Defendants point out that as a consequence of the recession, the position that Plaintiff held, DFM

5   1, was reduced to a part time position.  *Id.*  There is no evidence that the county would have

6   funded an additional DFM 2 position while Plaintiff was serving in the military.  USERRA's

7   reemployment provisions do not guarantee advancement–"[d]epending on the circumstances, the

8   escalator principle may cause an employee to be reemployed in a higher or lower position, laid

9   off, or even terminated." 20 C.F.R. § 1002.194; (*Milhauser v. Minco Products, Inc.,* 701 F.3d 268

10  (8th Cir. 2012)(holding that termination was the "position of employment" under USERRA that

11  the veteran would have had if his employment not been interrupted by military service)).

12  Plaintiff's §§ 4312 and 4313 claims that he should have been placed in a DFM 2 position should

13  be dismissed.

14          Plaintiff argues that he was not returned to the exact same amount of pre-deployment

15  hours.  Plaintiff makes no showing that the county's failure to assign him exactly the same hours

16  he had before he left amounts to a violation of §§ 4312 or 4313, considering his job.  On the

17  outset, "the 'reemployment' rights protected by §§ 4312 and 4313 apply only at the instant of

18  reemployment, and that other sections of USERRA operate to protect employees after they are

19  properly reemployed." *Francis v. Booz Allen & Hamilton, Inc.,* 452 F.3d 299 (4th Cir. 2006).

20  In regard to his regular pay hours, he argues that he was paid, on average, six less hours a month

21  pre-deployment than post-deployment.  He makes no showing that was true when he was

22  initially reemployed.  Further, Plaintiff acknowledges that his hours fluctuated before he left and

23  that it is driven by the amount of work that needed to be done.

24

1    Plaintiff argues that he was not returned to the same amount of out of class DFM 2

2    investigative hours that he had prior to his departure, and so was not returned to a position of like

3    pay in violation of §§ 4312 and 4313.  Prior to his deployment, Plaintiff was on call about a third

4    of the time and conducted about a third of the fire investigation work.  Dkt. 113, at 4.  Beginning

5    in December 2012, Plaintiff was placed on the fire investigation call-out rotation approximately

6    every third week.  Dkt. 34, at 9.  Accordingly, he had the same opportunity to earn money for out

7    of class work.  It is undisputed that the amount of investigative work depends on the number of

8    fires in any given period, and that the number of hours it takes to investigate varies fire to fire.

9    Moreover, Plaintiff conducted over a third of the fire investigations from his return in

10   December of 2012 until Ms. Blackwood was promoted on May 1, 2013.  Although Plaintiff

11   repeatedly requested that Mr. Wiggins be removed from the rotation, Mr. Lynam states that he

12   did not do so because he was trying to get off the rotation himself because he had other duties to

13   do.  When Plaintiff returned, beginning December 1, 2012 until the end of April 2013, he

14   performed 17 fire investigations, Mr. Wiggins performed 14 (four with Plaintiff), Mr. Lynam

15   performed 9 (all but three were with Plaintiff), and Ms. Turner performed 7 (one with Plaintiff).

16   Dkt. 113, at 11-12.  Of the 47 investigations, Plaintiff, then, performed around 36%, a similar

17   number, if not more, than he conducted before his deployment.

18   Plaintiff's claims under §§ 4312 or 4313 regarding the hours he was allowed to work

19   should be dismissed.  Because §§ 4312 and 4313 only provide immediate protection, Plaintiff

20   has not shown that his removal from the rotation several months after reemployment constitutes

21   a violation of §§ 4312 or 4313.  *See Francis,* at 303-304.

22   Plaintiff's argument that he was not returned to a position of like status when Defendants

23   failed to give him his prior 911 radio call sign 'FM3' back, a deputy fire marshal specific

24

1   identification card, new boots, and exclusive vehicle access (Dkt. 97) is likewise unavailing.  (In

2   his prior motion for summary judgment, Plaintiff also asserted his § 4312 and 4313 rights were

3   violated because when he returned to a work, he was not given a desk, a chair, a phone, or a fully

4   operable computer.  Dkt. 25-1, at 3.  Defendants directly disputed each of these allegations, (Dkt.

5   34, at 7) including pointing to emails Plaintiff sent the first day he returned to work (Dkt. 34, at

6   29) to show that he had an operable computer. His motion was denied.  Dkt. 37.)  More

7   importantly, Plaintiff cites no authority that any of these items (including those he made his prior

8   motion on) are related to the statutory requirement of his being in a "position of like . . . status." 38

9   U.S.C. § 4313(a)(2)(A).  Defendants' motion should be granted on his basis alone.

10       Further, aside from Plaintiff's assertions, there is no evidence in the record that the call

11   signs are in any manner a sign of "status" as contemplated under the statute.  Mr. Lynam stated that

12   he assigns the call signs and they are not related seniority or status.  Dkt. 78, at 20.  For example,

13   at one time, Mr. Wiggins, a temporary employee, was using the FM3 call sign and Ms.

14   Blackwood, who was a permanent employee in the same position, had a FM4 call sign.

15   Moreover, Mr. Lynam explained that he did not reassign Plaintiff the "FM3" radio call sign

16   because Mr. Wiggins had been using it and still had a number of investigations outstanding,

17   although he could not recall which ones specifically.  Dkt. 78, at 21.  Mr. Lynam felt it would

18   have been confusing to switch the call signs around.  *Id*.

19       Likewise, there is no evidence that a deputy fire marshal specific identification card or

20   badge is necessary to do the job or is a sign of status.  Ms. Blackwood stated that she has only

21   used her fire marshal badge once or twice.  Dkt. 109, at 5.  She stated that it is not necessary to

22   have for official county business, and is just an additional form of identification.  Dkt. 109, at 5.

23   Plaintiff states that he disagrees with Ms. Blackwood's assertion that a fire marshal badge is not

24

1   necessary for investigation work. Dkt. 98, at 7.  Plaintiff maintains that in the past he has been

2   asked for his credentials, which he asserts are his badge and county identification card. Dkt. 98,

3   at 7-8.  Plaintiff admits, though, that he conducted several investigations after he returned and

4   that not having these forms of identification did not affect his job performance. Dkt. 131, at 9.

5       Plaintiff makes no showing that the county's failure to purchase him new boots or give him

6   exclusive access to a vehicle amounts to a violation of §§ 4312 or 4313.  Plaintiff was given

7   boots when he started working for the county in 2007. Dkt. 78, at 7.  Plaintiff testified that after

8   he returned, he threw those boots away because they were worn out and asked for new boots.

9   Dkt. 78, at 7.  In response, Mr. Lynam asked Plaintiff to check in the evidence locker and see if

10  the boots he had before he left on deployment were in there. Dkt. 34, at 11.  Mr. Lynam later

11  saw Plaintiff with boots on during a fire investigation, and then saw a pair of boots with

12  Plaintiff's gear in the back of a response vehicle. Dkts. 103, at 69 and 34, at 11.  Mr. Lynam

13  assumed that Plaintiff had found his boots. Dkt. 34, at 11.  Plaintiff testified that he purchased

14  new boots, but did not ask the county to reimburse him because he wore those boots "on civilian

15  time too." Dkt. 78, at 8.  Mr. Lynam also told Plaintiff that Central Kitsap Fire and Rescue had

16  surplus boots and offered them to the employees of the Fire Marshal's Office. Dkt. 34, at 11.

17  There is no evidence that the county's failure to buy Plaintiff new boots in these circumstances is

18  a violation of §§ 4312 or 4313.

19      Insofar as a vehicle is concerned, after Plaintiff returned, he, like all the other employees, had

20  access to at least two shared vehicles. Dkts. 98, at 2; 34, at 8.  Plaintiff shared a vehicle "more

21  often than not" with Brad Wiggins. Dkt. 98, at 2.  Further, employees could also use their

22  personal vehicles on county business and be reimbursed at the IRS standard rate. Dkt. 34, at 8.

23  The county had magnetic signs that employees could attach to their personal vehicles to identify

24

1  the vehicle as being on official county-business.  Dkt. 34, at 8.  There is no evidence that the

2  county's failure to give Plaintiff exclusive access to a vehicle in these circumstances is a violation

3  of §§ 4312 or 4313.

4      Plaintiff has failed to show that there are issues of fact as to his claims under 38 U.S.C. §§

5  4312 and 4313.  Defendants are entitled to a judgment as a matter of law on this claim.  Plaintiff's

6  claims under 38 U.S.C. §§ 4312 and 4313 should be dismissed.

7  **D.  USERRA CLAIM UNDER § 4316 (BENEFITS)**

8      Under USERRA, a service member who is reemployed "is entitled to the seniority and other

9  rights and benefits determined by seniority that the person had on the date of the commencement

10  of service in the uniformed services plus the additional seniority and rights and benefits that such

11  person would have attained if the person had remained continuously employed." 38 U.S.C. §

12  4316(a).  "In determining entitlement to seniority and seniority-based rights and benefits, the

13  period of absence from employment due to or necessitated by uniformed service is not

14  considered a break in employment." 20 CFR § 1002.210.  While on active duty, the service

15  member is generally to be "deemed to be on furlough or leave of absence." 38 U.S.C. §

16  4316(b)(1)(A).  Service members are additionally:

17          Entitled to such other rights and benefits not determined by seniority as are
        generally provided by the employer of the person to employees having similar
18      seniority, status, and pay who are on furlough or leave of absence under a
        contract, agreement, policy, practice, or plan in effect at the commencement of
19      such service or established while such person performs such service.

20  38 U.S.C. § 4316(b)(1)(B).

21      To the extent that Plaintiff makes a claim under § 4316 regarding the county's failure to

22  give his prior radio call sign "FM3" back, a deputy fire marshal specific identification card or

23

24

1  badge, new boots, and exclusive vehicle access, the county's summary judgment motion should

2  be granted, Plaintiff's motion denied, and the claim dismissed.

3       As above, no showing is made that any of these items are "rights and benefits determined

4  by seniority" or "other rights and benefits not determined by seniority as are generally provided by

5  the employer of the person to employees having similar seniority, status, and pay who are on

6  furlough or leave of absence under a contract, agreement, policy, practice, or plan" as

7  contemplated by the statute in the circumstances presented here.  38 U.S.C. § 4316(a) and

8  (b)(1)(B);

9       Under the Collective Bargaining Agreement, Kitsap County employees hired after

10  January 1, 1998, like Plaintiff, are entitled to a longevity bonus of "1.0% of their annual salary on

11  the anniversary date." Dkt. 78, at 12.  The longevity bonus "shall be based upon continuous

12  employment, exclusive of those periods wherein an employee is placed upon leave without pay

13  status." Dkt. 78, at 12. "Continuous service" is defined as "the length of service by an employee

14  which includes periods of authorized paid leaves." Dkt. 78, at 11.  The longevity bonus is to be

15  paid on the pay period which follows the anniversary date of employment and is based on the

16  last 12 months of salary actually paid.  Dkts. 33 and 78, at 15.  Further, the Collective Bargaining

17  Agreement provides, "[i]n the event that an eligible employee terminates employment for any

18  reason, the employee shall receive a longevity bonus in a pro-rated amount, which is computed

19  as follows:  The number of months between the employee's anniversary date and termination date

20  shall be divided by twelve, and the result multiplied with the appropriate annual longevity bonus."

21  Dkt. 78, at 12.

22       In his prior motion, Plaintiff moved for summary judgment, arguing that he did not

23  receive a properly calculated longevity bonus, even though he was eligible for a five year bonus

24

1   in March of 2012.  Dkt. 25.  The Court found, at that time, that there were issues of fact

2   precluding summary judgment.  Dkt. 37.

3      To the extent that Plaintiff makes his § 4316 claim based on the Defendants' failure to pay

4   him a 2012 longevity bonus, Plaintiff's motion for summary judgment should be denied as moot.

5   Defendants now concede that he should have been paid such a bonus, and on March 27, 2014,

6   the county sent Plaintiff an additional check for $43.33 for his 2012 longevity bonus based on

7   the 21 days of military pay he received between March 2011 and March 2012.  Dkt. 98, at 21.

8   The county acknowledges that it "did not discover that the longevity was not paid until March

9   2014." Dkt. 98, at 21.  Defendants' motion on this issue should also be denied as moot.

10     As to the 2013 bonus, Kitsap County does not dispute that it owed Plaintiff a 2013

11  longevity bonus; Plaintiff does not dispute that he was paid one.  Plaintiff reiterates his prior

12  argument that his 2013 bonus was improperly calculated.  Plaintiff, however, provides no basis

13  for his supposition that his bonus should have been based on his earnings the year before he left.

14  Defendants point out that the bonus is paid based on the actual salary earned the prior year.

15  Dkts. 33 and 78.  Plaintiff's motion for summary judgment on this issue should be denied and

16  Defendants' motion granted.  There are no issues regarding benefits that remain for trial.

17  **E.  USERRA CLAIM UNDER § 4316 (WITHOUT CAUSE DISCHARGE)**

18     Under § 4316(c) a veteran who served over 180 days in the military, and is reemployed

19  under USERRA "shall not be discharged from such employment, except for cause within one year

20  after the date of such reemployment." "The employee may be discharged for cause based either on

21  conduct, or, in some circumstances, because of the application of other legitimate

22  nondiscriminatory reasons." 20 C.F.R. § 1002.248.

23

24

1    Plaintiff argues that he is entitled to summary judgment against Defendants because they

2    are liable for violating § 4316(c) when they failed to give him any investigative work after April

3    2013.  Plaintiff argues Defendants failure to give him investigative work (and the extra pay

4    associated with that work) constituted being "demoted."  As stated in Plaintiff's prior motion for

5    summary judgment, Plaintiff maintains that demoting a returning service member is the same as

6    discharge without cause citing *Foor v. Torrington Co.*, 170 F.2d 487, 490(7th Cir. 1948) and

7    *Paredez v. Pillsbury Co.,* 259 F. Supp. 493, 495 (C.D. Cal. 1966).  Dkt. 37.

8    Defendants argue that they had "cause"—that is a "legitimate nondiscriminatory reason" for

9    the alteration in Plaintiffs duties.  Defendants point out that the Kitsap County Board of

10   Commissioners, in the budget for 2013, eliminated one of the DFM 1 positions, reduced the

11   hours of the other DFM 1 position, and created a new DFM 2 position.  Plaintiff then had an

12   opportunity to compete for the new DFM 2 position, and was not the chosen candidate.

13   The parties cross motions for summary judgment as to this claim should be denied.  There

14   are issues of fact as to whether Plaintiff was "demoted," and if he was, whether Defendants had

15   "cause."

16   **F.  USERRA CLAIMS UNDER § 4311 (DISCRIMINATION, RETALIATION,
     HOSTILE WORK ENVIRONMENT, AND CONSTRUCTIVE DISCHARGE)**
17   **AND UNDER WLAD**

18                      1.  Discrimination and Retaliation Claims

19   Under 38 U.S.C. § 4311(a),

20       A person who is a member of . . ., performs, has performed, . . . or has an
         obligation to perform service in a uniformed service shall not be denied . . .
21       reemployment, . . . promotion, or any benefit of employment by an employer on
         the basis of that membership, . . . performance of service, . . . or obligation.
22

23   An employer is considered to have violated USERRA's 38 U.S.C. § 4311(a):

24

> if the person's membership . . ., service, . . . or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, . . . service, . . . or obligation for service.

38 U.S.C. § 4311(c)(1).  In deciding whether the employee's military service was "a motivating factor" in the employer's action, the burden-of-proof allocations approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401 (1983) are used.  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 899 (9th Cir. 2002).

> Under the scheme set forth in *Transportation Management*, the employee first has the burden of showing, by a preponderance of the evidence, that his or her protected status was "a substantial or motivating factor in the adverse employment action;" the employer may then avoid liability only by showing, as an affirmative defense, that the employer would have taken the same action without regard to the employee's protected status.

*Id.*  Under § 4311(b), USERRA'S anti-retaliation provision, "[a]n employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, . . . or (4) has exercised a right provided for in this chapter."  An employer is considered to have violated USERRA's 38 U.S.C. § 4311(b): "if the person's (A) action to enforce a protection afforded any person under this chapter, . . . or (D) exercise of a right provided for in this chapter, is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation, or exercise of a right." 38 U.S.C. § 4311(c)(1).

In order to make a claim under § 4311 for discrimination, Plaintiff must first identify an "adverse employment" action.  *Id.*  Plaintiff's briefing points to several different alleged instances of discrimination including: 1) the county's failure to follow certain policies, 2) failing to give Plaintiff his badge, fire marshal specific identification, call sign, and boots, 3) helping Ms.

1   Blackwood get promoted, 4) failing to help Plaintiff with the way his peers were treating him by

2   requiring that they all meet with him; 5) the county's delay in paying his 2012 longevity bonus

3   until after this law suit was underway; 6) forwarding Ms. Blackwood's complaint and Mr. Lynam

4   soliciting negative comments about him, 7) failing to promote him to DFM 2, and 8) removing

5   Plaintiff from the investigation rotation "without notice." Dkts. 97, and 123.

6          With the exception of Plaintiff's claim related to the failure to promote him and the removal

7   of him from the fire investigation schedule, Plaintiff's § 4311 claims for discrimination should be

8   dismissed because he has failed to show that his veteran's status was a substantial or motivating

9   factor in an adverse employment action.

10          Plaintiff fails to make out a prima facia case in regard to his claim Defendants

11   discriminated against him due to his military service when they allegedly didn't follow certain

12   policies, didn't give him certain items, helped Ms. Blackwood, and didn't hold a meeting so that

13   Plaintiff could tell his peers how they were treating him was making his PTSD worse.  Plaintiff

14   has not shown that these first four issues were "adverse employment actions." In the Title VII

15   context an adverse employment action is "any adverse treatment that is based on a retaliatory

16   motive and is reasonably likely to deter the charging party or others from engaging in a protected

17   activity." *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir.2000) (citing EEOC Compliance

18   Manual Section 8, "Retaliation," ¶ 8008 (1998)). He has not shown that the county's failure to

19   follow certain policies were adverse employment actions against him here. (He argues the county

20   failed to follow its extra help policy and remove Mr. Wiggins and Mr. Shepherd from their duties

21   so Plaintiff did not have to share hours with them, and argues that it failed to follow its

22   confidentiality policy when Mr. Lynam inadvertently left the summary of the interviewers' notes

23   on the credenza in the office.)  Plaintiff has not shown that the county's failure to give him a

24

ORDER ON PARTIES' MOTIONS FOR PARTIAL
SUMMARY JUDGMENT- 29

1   badge, fire marshal specific identification, the FM3 call sign, and boots was an adverse

2   employment action.  Plaintiff was given adequate identification, a call sign, and had boots.

3   Likewise, Plaintiff has not shown that helping Ms. Blackwood get promoted was an adverse

4   employment action.  Plaintiff has not shown that not holding a meeting so that Plaintiff could

5   confront his peers about how he felt he was being treated was an adverse employment action.

6   (Further, to the extent that Plaintiff argues that Defendants failure to agree to this meeting as an

7   "accommodation" for his PTSD violated various statutes, Plaintiff does not dispute that his

8   healthcare provider stated that he had no limitations as a result of his PTSD.  Plaintiff points to

9   no authority that an employer must make accommodations for a disability when the employee

10   has no limitations as a result of that disability.  The ADA provides that employers must make

11   "reasonable accommodations to the known physical or mental limitations of an otherwise

12   qualified individual with a disability" unless "the accommodation would impose an undue

13   hardship." 42 U.S.C. § 12112(b)(5)(A)).

14        Moreover, even if he had shown that the county's failure to follow its policies, give him

15   certain items, helping Ms. Blackwood, and not helping him by holding a meeting were adverse

16   employment actions, he has failed to show any evidence, that his "protected status was a

17   substantial or motivating factor in the adverse employment action." *Leisek,* at 899.

18        Further, Plaintiff makes no showing that the county's paying him $43.33 for his 2012

19   longevity bonus after this case began was an adverse employment action motivated at all by his

20   prior military service.  Plaintiff has not shown that in the circumstances here that the county's

21   helping Ms. Blackwood file a complaint against him, was in any manner motivated by his prior

22   military service.  Moreover, he has not shown that Mr. Lynam's statement to Ms. Blackwood that

23   she should advise the county "of any further issues between her and [Plaintiff]" was motivated by

24

1  his service in the military.  Plaintiff's claim that this constitutes "solicitation of negative comments

2  about him" or encouraging his co-workers to "spy" on him and so are adverse employment actions

3  motivated by his military service is frivolous.  The county explains that it had a duty to take Ms.

4  Blackwood's concerns seriously.

5          In regard to Plaintiff's claim that the Defendants discriminated and retaliated against him

6  due to his military service when they failed to promote him to DFM 2 and removed him from the

7  fire investigation rotation, he has identified valid adverse employment actions.  Plaintiff must

8  next point to evidence that the county's actions were motivated, at least in part, by his status as a

9  veteran or in retaliation for his exercising his rights under the statute.

10             Under USERRA, discriminatory motivation of the employer may be reasonably
                inferred from a variety of factors, including proximity in time between the
11             employee's military activity and the adverse employment action, inconsistencies
                between proffered reason and other actions of the employer, an employer's
12             expressed hostility towards members protected by the statute together with
                knowledge of the employee's military activity, and disparate treatment of certain
13             employees compared to other employees with similar work records or offenses.

14  *Leisek*, at 900 (internal quotations omitted).  Plaintiff attempts a "shotgun" approach raising any

15  and all references made to his military service as evidence of a discriminatory motive or

16  retaliation.  For example, Plaintiff discusses Mr. Lynam's use of the phrase "drink more tea."  Dkt.

17  123.  Apparently, in a September 2007 evaluation, in response to a question on how to improve

18  his job performance, Plaintiff was told to "slow down" and "drink more tea."  Dkt. 103, at 54.  Mr.

19  Lynam explained that he wrote this because he and Plaintiff had talked on several occasion about

20  "creating the relationships that everything that we do depends on . . . that he needed to take time

21  to make those interpersonal relationships that make him, and ultimately all of us, effective."  Dkt.

22  103, at 54.  Mr. Lynam asked if Plaintiff had done anything like this and Plaintiff described a

23  "situation he had to do in Iraq that drove him crazy which was to drink endless amounts of tea

24

with whoever they were, the leaders . . . It drove him nuts and he was sick of tea, but it was

something necessary that he had to do while he was in Iraq." Dkt. 103, at 54. Mr. Lynam states

that "became our code for 'you need to slow down and you need to exercise patience,' that he

needed to drink more tea with these people, meaning to use the same process here to be effective

that he did in Iraq." Dkt. 103, at 54. As further evidence of anti-military discrimination Plaintiff

argues that his description of his leadership style as one of creating a "common-enemy" to

motivate military subordinates is a USERRA protected activity. He argues that some members

of the interview panel's feeling that this was contrary to the leadership style which was

appropriate to the DFM 2 job was discriminatory because they did not consider it as a valid

replacement experience. These, like several other of Plaintiff's proffered examples are not

instances of discrimination or anti-military animus.

Plaintiff points to only slight evidence that the decision not to promote him was

motivated by his exercise of his rights under the statute. On January 2, 2013, he filed his ESGR

complaint - four to five months before the county failed to select him for promotion, and because

he was not selected, removed him from the fire investigation rotation. Although very thin, the

timeframe is reasonably close enough such that a jury could infer a retaliatory motivation.

*Leisek*, at 899. Accordingly, Plaintiff has pointed to evidence that the decision not to promote

him was motivated by his exercise of his rights under the statute contrary to § 4311.

The burden now shifts to the county to establish as an uncontroverted fact that it would

have not have promoted him (or as a consequence, removed him from the fire investigation

rotation) even if he had not been a member of the military or exercised his rights under

USERRA. *Leisek*, at 899.

1   Although Defendants point to each of the panelists' discussion of Plaintiff's shortcomings

2   and Ms. Blackwoods' strengths to show that they would not have promoted him and would have

3   removed him from the rotation anyway, they have not shown that this is uncontroverted.

4   Plaintiff points out that he had fire investigation experience and that Ms. Blackwood did not.

5   There are genuine issues of material fact both as to whether Plaintiff's ESGR complaint

6   was a "motivating factor" in the county's decision not to promote Plaintiff and to remove him from

7   the investigation rotation.  There are also issues of fact as to whether the county would have

8   made the same decision without regard to his protected status.  Defendants' motion for partial

9   summary judgment on these § 4311-based claims, and Plaintiff's to the extent that he makes one,

10   should be denied.

11                                    2.   Hostile Work Environment

12   To the extent that Plaintiff makes a hostile work environment claim under either

13   USERRA or WLAD, based on either his military status or his disability, his claims should be

14   dismissed.

15   Although the Ninth Circuit has not ruled on whether a hostile work environment claim can be

16   brought based on an alleged USERRA violation, USERRA is to liberally construed in favor of

17   veterans and the Court will assume, without deciding, that such a claim should be permitted.  *See*

18   *Montoya v. Orange County Sheriff's Dept.*, --- F.Supp.2d ----, 2013 WL 6662707 (C.D.Cal.

19   2013).  The standard used for a hostile environment claim under Title VII should be used in the

20   context of a USERRA hostile environment claim.  *Id.* (*citing Vega-Colon v. Wyeth*

21   *Pharmaceuticals,* 625 F.3d 22, 32 (1st Cir. 2010)).  The elements for establishing a hostile work

22   environment under WLAD is similar.  *Estevez v. Faculty Club of University of Washington*, 129

23   Wn.App. 774 (2005).

24

1   Accordingly, to make a hostile work environment claim based on USERRA, a plaintiff must

2 show harassing behavior was "sufficiently severe or pervasive to alter the conditions of his

3 employment." *Vega-Colon,* at 32 (*quoting Pennsylvania State Police v. Suders*, 542 U.S. 129,

4 133, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)). To determine whether conduct is severe and

5 pervasive, the court looks at the context of the alleged harassment to determine its frequency and

6 severity, whether it is physically threatening or humiliating, and the extent to which it

7 unreasonably interferes with the employee's work performance. *Vasquez v. County of Los*

8 *Angeles*, 349 F.3d, 634, 642 (9th Cir. 2003). "He must also establish that the offending behavior

9 creates an abusive working environment" and that the harassment was both objectively and

10 subjectively offensive." *Vega-Colon,* at 32.

11   Plaintiff's claims for hostile work environment should be dismissed.  Plaintiff has failed to

12 point to evidence that the harassing behavior was "sufficiently severe or pervasive to alter the

13 conditions of his employment." *Vega-Colon,* at 32.  First, he makes no showing that his co-

14 workers' refusal to socialize with him, making him feel isolated, excluding him from

15 conversations, referring him to their supervisor, etc. is connected either to his military service or

16 his disability.  He fails to show that the county's failure to give him certain equipment (boots,

17 identification and call sign) or training, remove Mr. Wiggins or Mr. Shepherd, or use an

18 "unlicensed, un-bonded, untrained" investigator to investigate his tort claim is connected  either to

19 his military service or his disability.   Secondly, Plaintiff makes no showing that even if it was

20 connected, that it was severe enough that a reasonable person would consider the behavior

21 abusive or hostile. *Faragher v. City of Boca Raton*, 524, U.S. 775, 787 (1998).  Plaintiff makes

22 no showing that it occurred frequently, that it was physically threatening or humiliating, or that it

23 unreasonably interfered with his work performance.

24

1    Plaintiff makes no showing that Mr. Lynam's refusal to hold a meeting so that Plaintiff could

2    explain to his peers that their treatment of him was affecting his PTSD was severe enough that a

3    reasonable person would consider the behavior abusive or hostile.  Plaintiff's allegation regarding

4    the county's decision to not promote him or to remove him from the investigation rotation is

5    addressed above.  His claim for hostile work environment should be dismissed.

6                                    3.   Constructive Discharge

7    'Constructive discharge occurs when, looking at the totality of the circumstances, a reasonable

8    person in the employee's position would have felt that he was forced to quit because of

9    intolerable and discriminatory working conditions." *Wallace v. City of San Diego*, 479 F.3d 616,

10   625 (9th Cir. 2007) (noting that where, as here, a plaintiff is asserting constructive discharge in

11   violation of USERRA or other federal law, federal law applies)(*internal quotations and citations*

12   *omitted*). "Whether working conditions were so intolerable and discriminatory as to justify a

13   reasonable employee's decision to resign is normally a factual question for the jury. In order to

14   prevail, a plaintiff alleging a constructive discharge must show some aggravating factors, such as

15   a continuous pattern of discriminatory treatment." *Id.,* at 626 (*internal quotations and citations*

16   *omitted*).

17   Plaintiff's claims for constructive discharge raised under USERRA and WLAD should also be

18   dismissed.  Plaintiff has failed to point to evidence of that a reasonable person in the employee's

19   position would have felt that he was forced to quit because of intolerable and discriminatory

20   working conditions.  *Wallace* at 625.

21   **G.  USERRA CLAIM UNDER § 4318 (PENSION)**

22   Section 4318 of USERRA governs pension plans for returning veterans.  38 U.S.C. § 4318.

23   An employer reemploying a veteran shall 'be liable to an employee pension benefit plan for

24

ORDER ON PARTIES' MOTIONS FOR PARTIAL
SUMMARY JUDGMENT- 35

1   funding any obligation of the plan . . . and shall allocate the amount of any employer contribution

2   for the person in the same manner and to the same extent the allocation occurs for other

3   employees during the period of service." 38 U.S.C. § 4318(b)(1).  Guidance on calculating the

4   benefit and an employee's rate of compensation is found under 20 C.F.R. § 1002.267, which

5   provides:

6       In many pension benefit plans, the employee's compensation determines the
        amount of his or her contribution or the retirement benefit to which he or she is
7       entitled.

8       (a) Where the employee's rate of compensation must be calculated to determine
        pension entitlement, the calculation must be made using the rate of pay that the
9       employee would have received but for the period of uniformed service.

10      (b)(1) Where the rate of pay the employee would have received is not reasonably
        certain, such as where compensation is based on commissions earned, the average
11      rate of compensation during the 12-month period prior to the period of uniformed
        service must be used. . .

12

13      Plaintiff's motion for summary judgment on his claim that the Defendants violated § 4318

14   should be granted.  Although Plaintiff failed to make the proper showing in his prior motion for

15   summary judgment on the issue, he has now shown that his rate of pay varied and such that it

16   was "not reasonably certain," for the purposes of 20 C.F.R. § 1002.267.

17      The wage records that Kitsap County submitted to the state Department of Retirement

18   Systems was an estimation of what he would have earned based on the number of hours his

19   position was approved to work.  Dkt. 118.  Parties do not dispute that Plaintiffs' hours fluctuated

20   based on the amount of work that needed to be done, including the variations due to fire

21   investigations.  Like a commission, then, his compensation was not "reasonably certain" and "so the

22   average rate of compensation during the 12-month period prior to the period of uniformed service

23   must be used." 20 C.F.R. § 1002.267.  Plaintiff points to the Declaration of Dwayne

24   Normandeau, a Certified Public Accountant, who states that Plaintiff's earnings for the 12 month

1   period before his deployment (November 15, 2008-November 15, 2009) was $60,308.00 or

2   $5,026.00/month.  Dkt. 99, at 2.  Mr. Normandeau calculates that Defendants should have paid

3   $10,922.98 into Plaintiff's retirement (Dkt. 99, at 3), rather than $8,798.26, and so did not pay

4   $2,124.72 that Plaintiff was due.  Defendants do not point to evidence challenging Mr.

5   Normandeau's calculations.  Plaintiff's motion for summary judgment on this issue should be

6   granted, and Defendants' motion denied.

7   **H.  CONCLUSION**

8       Defendants' motion for summary dismissal of Plaintiff's USERRA claims under §§4312 and

9   4313 (reemployment) and § 4316 (benefits) should be granted and the claims dismissed.

10  Plaintiff's cross motion on the same should be denied.  Defendants' motion to summarily dismiss

11  Plaintiff's hostile work environment and constructive discharge claims should be granted and

12  those claims should be dismissed.  Plaintiff's motion for summary judgment on his USERRA

13  claim under § 4318 (pension) should be granted and Defendants' motion on the pension claim

14  should be denied.

15      Defendants' motion for summary dismissal of Plaintiff's USERRA claim for § 4311

16  (discrimination) and claims under WLAD for discrimination should be granted, in part, and

17  denied only to the extent that the claims are based on the failure to promote him and his removal

18  from the fire investigation rotation.  Defendants' motion and Plaintiff's cross motion on the

19  USERRA claim under § 4316 (without cause discharge) should both be denied.  Plaintiff's § 4316

20  (without cause discharge) claim remains.

21       It is apparent that Plaintiff's return to work was difficult for him and his employer.  Although

22  USERRA and other laws provide returning veterans many protections, they do not guarantee

23  happiness on return to work.  Many of the complaints Plaintiff raises here are related to his

24

happiness and his perception of work place civility, but are not violations of rights protected by law. The evidence on the remaining claims that were the subject of this motion, the § 4311 USERRA claim and WLAD claim (to the extent they are based on the failure to promote him and his removal from the fire investigation rotation) and his USERRA claim under § 4316 (without cause discharge), is very thin, but is sufficient to allow to proceed on those claims.

### III.    ORDER

It is **ORDERED** that:

- Plaintiff's motion to strike (Dkt. 33) is **DENIED**;

- Defendants' motion to strike (Dkt. 128) is **GRANTED**;

- Defendants' Motion for Partial Summary Judgment Regarding Claims for Reemployment, Failure to Promote, and Discrimination (Dkt. 77) is **GRANTED,** in part, and **DENIED**, in part, as stated herein;

- Plaintiff's Cross Motion for Partial Summary Judgment (Dkt. 97) is **GRANTED,** in part, and **DENIED**, in part, as stated herein; and

- Defendants' Motion for Partial Summary Judgment Regarding Hostile Work Environment, Constructive Discharge and Retaliation (Dkt. 90) is **GRANTED,** in part, and **DENIED**, in part, as stated herein**.**

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 22nd day of May, 2014.

*Robert J Bryan*

ROBERT J. BRYAN
United States District Judge